IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USERNAMES "ZABAR STACKS (BUSHWICK BABY)"; "ZABAR AARON STACKS (BUSHWICK BABY)"; AND IRICK ZABAR (MARIO WORLD WOWO)" AND INSTAGRAM USERNAME "BARBARTHIRTYDAYS" THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 21-MJ-311 |

**AFFIDAVIT IN SUPPORT OF**
**<u>AN APPLICATION FOR A SEARCH WARRANT</u>**

I, DANIEL KONESCHUSKY, being first duly sworn, hereby depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.      I make this affidavit in support of an application for a search warrant for information associated with certain Facebook and Instagram usernames that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the usernames.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), and have been since August 2016.  Before becoming a Special Agent, I was a Border Patrol Agent with United States Customs and Border Protection from June 2014 until I

joined ATF.  I have participated in numerous investigations involving robberies, burglaries, firearms offenses, vehicle thefts and gang related violence.  I have experience executing search warrants involving social media accounts like the warrant sought herein.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 922(g) and 2119 have been committed by Zabar Irick.  There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

**PROBABLE CAUSE**

5.      On February 10, 2021, a grand jury in the Eastern District of New York returned an indictment charging Zabar Irick with two counts of possessing a firearm while subject to a protective order in violation of 18 U.S.C. § 922(g)(8), and a warrant was issued for Irick's arrest. (See United States v. Zabar Irick, 21-CR-82 (WFK).)  I am aware of at least eight separate orders of protection issued against Irick relating to seven separate individuals.  The order relevant to the charges in the indictment was issued on May 21, 2020, and was in effect until November 27, 2020.

6.      On February 11, 2021, Irick was arrested, arraigned before the Honorable Lois Bloom, United States Magistrate Judge, and ordered permanently detained.

November 4, 2020 Incident

7.      The first charge in the Indictment is based on an incident that took place on November 4, 2020.  On that date, law enforcement received a report of a physical altercation taking place in the vicinity of 390 Bushwick Avenue, Brooklyn, New York ("390 Bushwick").

8.      Officers from the New York City Police Department (the "NYPD") responded to the scene and encountered a group of males, including Irick, who was known to both responding officers.

9.      After the group was disbanded, one of the responding officers ("Officer-1") recovered a KelTec Model P32 .32 caliber pistol with serial number C4Z74 (the "November 4 Firearm") from the ground in a fenced off trash receptacle area (the "Fenced Area").

10.     Based on surveillance video footage from the area, prior to the arrival of law enforcement, Irick appears to engage in a confrontation with a group of individuals.  He appears to be arguing with one individual in particular, who was later identified by law enforcement (hereinafter "Victim-1").  Based on Irick's posture, the way he is holding his hands and arms, and the reactions of the group, I believe based on my training and experience, that Irick was brandishing a firearm and pointing it at others in the group.

11.     As the responding officers approached, Irick appears to drop something in the Fenced Area.  After the larger group was dispersed, Irick can been seen jumping into the Fenced Area and seemingly searching the ground for something.

12.     Officer-1 approached Irick while he was in the Fenced Area and Irick told Officer-1 that he was searching for his phone.  Officer-1 reported that he informed Irick that his

phone was in his hand, and reported that Irick in fact had two phones in his hand.  Irick then jumped out of the Fenced Area and walked away.  Shortly thereafter, Officer-1 recovered the November 4 Firearm.

13.     The Office of Chief Medical Examiner for The City of New York (the "OCME") tested swabs taken from the November 4 Firearm for DNA and found that DNA recovered from that firearm was consistent with an abandonment sample on file of Irick's DNA (the "Irick Abandonment Sample").

November 10, 2020 Incident

14.     The second charge in the Indictment is based on an incident that took place on November 10, 2020.  On that date, Irick was captured on video engaging in a shootout at approximately 1:00 pm in the afternoon in the middle of a crowded street in the vicinity of 390 Bushwick.

15.     In the surveillance videos, Irick begins to cross the street and appears to recognize two individuals walking on the sidewalk on the opposite side of the street, hides behind an occupied vehicle and appears to begin exchanging fire with one of the two men on the sidewalk. One of those two individuals appears to be Victim-1.

16.     After the shooting seemingly stops, Irick appears to drop something under a parked, but occupied car.  The car immediately pulls away and Irick returns, picks up the item and places something in a nearby trash bag.  Law enforcement recovered a Smith & Wesson Model M&P 40 Shield .40 caliber pistol with serial number HUE9981 (the "November 10 Firearm") from that trash bag shortly thereafter.

4

17.     DNA swabs taken from the November 10 Firearm were tested by the OCME and found to be consist with DNA from the Irick Abandonment Sample.

February 6, 2021 Incident

18.     The two charged incidents are just two of many violent incidents in which Irick has been involved.

19.     There is evidence that the weekend prior to his arrest, Irick was involved in yet another shooting incident involving Victim-1.

20.     On February 6, 2021, at approximately 4:00 pm, a shooting in the vicinity of 390 Bushwick was reported to 911.  Law enforcement recovered surveillance video footage from the area depicting an individual (the "Shooter") wearing a distinct purple hooded sweatshirt chasing and apparently shooting at another individual who appears to be Victim-1.  The Shooter then ran into a building at 370 Bushwick Avenue, which is on the same block as 390 Bushwick and is the building in which Irick resides.

21.     Irick was arrested wearing a purple sweatshirt that matches the sweatshirt worn by the Shooter on February 6, 2021.

Car Jacking Incident

22.     There is evidence that, prior to the three aforementioned shooting incidents, Irick was involved in a carjacking on August 22, 2020.

23.     Specifically, on or about August 22, 2020, the NYPD received a 911 call reporting a carjacking in the vicinity of Graham Avenue and Scholes Street, Brooklyn, New York.  The car, a 2010 black BMW with Pennsylvania license plates (hereinafter the "Stolen

5

Car"), was reported to have been stolen at gunpoint by multiple individuals at approximately 2:00 p.m. that same day.  I understand that the reported conduct violates 18 U.S.C. § 2119 (carjacking).

24.      On or about September 1, 2020, the Stolen Car was stopped by an NYPD law enforcement officer ("Officer-2") in the vicinity of Bushwick Avenue and McKibben Street in Brooklyn, New York, for illegally tinted windows.  Officer-2 had previously observed a male enter the Stolen Car and, after stopping the Stolen Car, Officer-2 observed that same male, who had been driving the Stolen Car, exit the driver's seat of the vehicle and run.  Officer-2 recognized the male exiting the Stolen Car to be Zabar Irick.

SUBJECT ACCOUNT 1

25.      On or about August 29, 2020, a Facebook account with profile name "Zabar Stacks (Bushwick Baby)," which, based on photographs and videos posted to the account, is believed to belong to Irick ("SUBJECT ACCOUNT 1"), posted a public video depicting Irick driving in a vehicle that appears to be the Stolen Car.  A headrest depicting the BMW symbol is visible in portions of the video, as is an air freshener hanging from the car's rearview mirror (not pictured below), which matches the air freshener in the recovered Stolen Car.  In the video, Irick

can also be seen to be holding a black and silver firearm.  Still images from that video are copied below:



26.     On or about February 5, 2021, the profile picture for SUBJECT ACCOUNT 1 depicted a photograph that appears to be Irick wearing the purple sweatshirt that Irick was wearing at the time of his arrest on February 11, 2021.  That sweatshirt matches the sweatshirt worn by the Shooter during the February 6, 2021 shooting incident described above.

27.     On or about February 6, 2021, just over four hours prior to the shooting incident on that day, the user of the Irick Facebook Account also posted a video of Irick wearing that same purple sweatshirt.

SUBJECT ACCOUNT 2

28.     On or about July 25, 2015, a Facebook account with profile name "Zabar Aaron Stacks (Bushwick Baby)," which, based on photographs and videos posted to the account, is believed to belong to Irick ("SUBJECT ACCOUNT 2"), posted a public photograph depicting a

7

person I recognize as Irick with an individual who appears to be holding a firearm.  That

photograph is copied below:



29.     On or about September 14, 2015 and September 14, 2016, the user of SUBJECT

ACCOUNT 2 posted a public photograph depicting a person I recognize as Irick with an

individual who appears to be holding a firearm.  That photograph is copied below:



30.     On or about January 31, 2020, the user of SUBJECT ACCOUNT 2 uploaded a YouTube video in which Irick appears to be holding a firearm.  A still image from that video is copied below:



SUBJECT ACCOUNTS 3 & 4

31.     Law enforcement has identified two additional accounts that, based on public information, including the names of the accounts and photographs and videos posted to the accounts, are believed to belong to Irick.  These include a Facebook account with username "Irick Zabar (MarioWorld WoWo)" ("SUBJECT ACCOUNT 3") and an Instagram account with username "barbarthirtydays" ("SUBJECT ACCOUNT 4," together with SUBJECT ACCOUNTS 1, 2 and 3, the "SUBJECT ACCOUNTS").

32.     The current cover photograph associated with SUBJECT ACCOUNT 3 depicts a group of young males who appear to be positioning their hands in gang signs.  The user of SUBJECT ACCOUNT 3 also frequently publicly posts about "Stackers" or "Stacks," which I

9

understand to be a reference to the gang, Young Stackers, of which I understand Irick to be a member.

33.     Based on my training and experience, I know that individuals engaged in criminal conduct often upload photographs, images and written statements reflecting that criminal conduct on social media accounts, and use social media accounts to communicate with other regarding that conduct.  Moreover, individuals engaged in criminal conduct who upload such materials to one social media account, will often use multiple social media accounts and upload such materials to their other accounts as well.

Training and Experience

34.     Based on my training and experience, I know that co-conspirators involved in robberies and burglaries, including carjacking incidents, often communicate by social media regarding the planning and execution of the robbery or burglary, and take photographs associated with the crime, including, in the case of a carjacking, photographs of the stolen vehicle, its contents and of themselves with the stolen items, which they share or post publicly or privately on social media.

35.     Based on the foregoing, there is probable cause to believe that the SUBJECT ACCOUNTS contain evidence of the carjacking and evidence of the identities of perpetrators involved in the carjacking, including communications relating to the carjacking incident, photographs associated with the Stolen Car and geolocation information relating to the location of the user of the SUBJECT ACCOUNTS at or around the time of the carjacking.

36.     Based on my training and experience, I also know that individuals involved in shootings often use social media accounts to coordinate the hiding of firearms; to coordinate

10

meetup locations and lookouts; to tipoff a shooter about the location of a victim; and to purchase or discuss accessing a firearm.

37.     Based on the facts set forth above, there is probable cause to believe that Irick and Victim-1 were engaged in an ongoing dispute.  Based on my training and experience, there is probable cause to believe that, in light of that ongoing dispute, Irick used the SUBJECT ACCOUNTS to communicate either directly with Victim-1 or with third parties about the dispute with Victim-1, and to coordinate with others as described above in connection with the shooting incidents.

38.     Based on my training and experience, I know that individuals who possess and commit crimes using firearms often maintain or send photographs of those firearms on or using social media.  Based on the photographs, videos and comments posted publicly to the SUBJECT ACCOUNTS as described above, there is further reason to believe that Irick maintains or sends photographs or videos of firearms using the SUBJECT ACCOUNTS and uses the subject accounts to communicate regarding criminal activity.

<u>Facebook Generally</u>

39.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

40.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical

11

address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

41.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

42.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

43.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations

to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

44.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

45.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

46.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

47.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as

13

webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

48.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

49.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

50.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

51.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

52.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

53.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date),

the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

54. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access,

15

use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

55.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

Instagram Generally

56.     Instagram is centered on photography, videography, and private text-based messaging.  Instagram owns and operates a free-access social-networking website of the same name that can be accessed at http://www.instagram.com.   Its records are managed by Facebook.

57.     Instagram allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and other information.  Users can access Instagram through the Instagram website or by using an electronic application ("app") created by the company that allows users to access the service through a mobile device.  A user's account is tied to an account name, which is static, as well as an account display name, which is dynamic and can be altered by the user without any need to delete the user's account.

58.     Upon creating an Instagram account, an Instagram user must create a unique Instagram username and an account password.  This information is collected and maintained by Instagram.

59.     Instagram's users can use their accounts to post and share photographs, videos, and other information from computers and other web-enabled devices, such as certain mobile devices.  Instagram also includes a camera application that, when used on a mobile device containing a camera, can assist a user in taking photographs and videos and posting those photographs and videos to his or her Instagram account.

60.     Instagram's users may create "stories" in which users may share photos and/or videos for a time-limited period.

61.     Instagram's users may exchange "direct messages," which are private textual, photographic, or videographic messages between one or more users.

62.     Instagram asks users to provide basic contact information, either during registration process or thereafter.  This information may include the user's full name, contact email addresses, telephone numbers, screen names, websites, and other personal identifiers.

63.     Instagram's users can adjust privacy settings for the photographs, videos, communications, and information associated with their accounts.  By adjusting these privacy settings, a user can, for example, require authorization before anyone can follow, or have access to photographs posted by the user.  Instagram offers other account settings that users can adjust, to control, for example, the types of notifications they receive from Instagram.

64.     Instagram offers users and members of the general public (the latter of whom may not be subscribers of Instagram) a search functionality allowing for the identification of the

Provider's users and content publicly shared on Instagram by other users.  The search functionality allows for the searching of users both by their username and their display name.

65.     Instagram's users may "follow" other users.  When a user "follows" another user, the user automatically receives photographs posted by the "followed" user.  Depending on a user's privacy settings, a request to "follow" may have to be accepted by the "followed" user before the requesting user can view the "followed" user's photographs and/or videos.  Users may also "unfollow" users, that is, stop following them or block them, which prevents the blocked user from following that user.

66.     Instagram's users may have "friends," which are other individuals with whom the user can share information without making the information public.  Friends on Instagram may come from either contact lists maintained by the user, other third-party social media websites and information, or searches conducted by the user on Instagram profiles.  Instagram collects and maintains this information.

67.     Instagram's users may comment on photographs or videos posted by other users.

68.     Instagram's users have the option to upload photographs and/or videos with geolocation information.  The geolocation data is stored with the photographs and/or videos so long as that functionality is enabled.

69.     Instagram's users have access to a "New Feed," which shows activity among a user's network or followed users.  The News Feed, among other things, displays photographs and/or videos that others in a user's network have liked and comments among individuals in a user's network.

18

70.     Instagram's users may share their own photographs and/or videos via third-party social networking services (e.g., Twitter).  Users may also share other user's public photographs and/or videos via third-party social networking services.

71.     For each user, Instagram also collects and retains information, called "log file" information, every time a user requests access to Instagram, whether through a web page or through an app.  Among the log file information that Instagram's servers automatically record is the particular web requests, any IP address associated with the request, type of browser used, and referring/exit web pages and associated URLs, pages viewed, dates and times of access, and other information.

72.     Instagram specifically retains IP logs for a given user or IP address.  These logs may contain information about the actions taken by the user or IP address on Instagram, including information about the type of action, the date and time of the action, and the user and IP address associated with the action.

73.     Instagram also collects and maintains "cookies," which are small text files containing a string of numbers that are placed on a user's computer or mobile device and that allows Instagram to collect information about how a user uses Instagram.  For example, Instagram uses cookies to help users navigate between pages efficiently, to remember preferences, and to ensure advertisements are relevant to a user's interests.

74.     Instagram also collects information on the particular devices used to access Instagram.  In particular, Instagram may record "device identifiers," which includes data files and other information that may identify the particular electronic device that was used to access Instagram.

19

75.     Instagram also collects other data associated with user content.  For example, Instagram collects any "hashtags" associated with user content (i.e., keywords used), "geotags" that mark the location of a photo and which may include latitude and longitude information, comments on photos, and other information.

76.     Instagram also may communicate with the user, by email or otherwise.  Instagram collects and maintains copies of communications between Instagram and the user.

77.     Social networking providers like Instagram typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of services utilized, and the means and source of any payments associated with the service (including any credit card or bank account numbers).  In some cases, Instagram users may communicate directly with Instagram about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Instagram typically retain records about such communications, including records of contacts between the user and Instagram support services, as well as records of any actions taken by Instagram (including banning or suspending an account) as a result of the user's communications or activity.

78.     As explained herein, information stored in connection with an Instagram account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, an Instagram user's account activity, IP log, stored electronic communications, and other data retained by Instagram, can indicate who has used or controlled the Instagram account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing

a search warrant at a residence.  For example, profile contact information, direct messaging logs, shared photos and videos, and captions (and the data associated with the foregoing, such as geolocation, date and time) may be evidence of who used or controlled the Instagram account at a relevant time.  Further, Instagram account activity can show how and when the account was accessed or used.  For example, as described herein, Instagram records the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Additionally, Instagram builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Instagram "friends" to locate each other.  This geographic timeline information may tend to either inculpate or exculpate the Instagram account owner.  Lastly, Instagram account activity may provide relevant insight into the Instagram account owner's state of mind as it relates to the offense under investigation.  For example, information on the Instagram account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

79.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Instagram, such as account access information, transaction information, and other account information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

80.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

81.     Based on the foregoing, I request that the Court issue the proposed search warrant.

82.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

83.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

Respectfully submitted,

Daniel Koneschusky
Special Agent
Bureau of Alcohol, Tobacco, Firearms &
Explosives

Subscribed and sworn to before me by telephone
on March 11, 2021

HONORABLE CHERYL L. POLLAK
CHIEF UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

23

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook usernames (i) "Zabar Stacks (Bushwick Baby) (SUBJECT ACCOUNT 1); (ii) "Zabar Aaron Stacks (Bushwick Baby)") (SUBJECT ACCOUNT 2); (iii) "Irick Zabar (MarioWorld WoWo" (SUBJECT ACCOUNT 3); and (iv) "barbarthirtydays" (Instagram Account) (SUBJECT ACCOUNT 4),[1] that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

---

[1] The associated URLs are (i) www.facebook.com/profile.php?id=100014596988051; (ii) www.facebook.com/YSWowo; (iii) www.facebook.com/Stackerwo; and (iv) www.instagram.com/barbarthirtydays/.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each username listed in Attachment A:

(a)      All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)      All activity logs for the accounts and all other documents showing the user's posts and other Facebook or Instagram activities from July 1, 2015 to present;

(c)      All photos and videos uploaded by that username and all photos and videos uploaded by any user that have that user tagged in them from July 1, 2015 to present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)      All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; hashtags; friend lists, including the friends' Facebook user identification numbers; follower lists, including the follower Instagram user identification number; groups and networks

of which the user is a member, including the groups' Facebook or Instagram group identification numbers; future and past event postings; rejected "Friend" or "Follow" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook or Instagram applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that username, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from July 1, 2015 to present, including all Messenger activity, private or direct messages, chat history, video and voice calling history, and pending "Friend" or "Follow" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the accounts;

(i)     All records of the accounts' usage of the "Like" feature, including all Facebook or Instagram posts and all non-Facebook and non-Instagram webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends or followers created by the accounts;

(l)     All records of Facebook or Instagram searches performed by the accounts from July 1, 2015 to present;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

2

(o)     The length of service (including start date) and the means and source of any
         payments associated with the service (including any credit card or bank account
         number);

(p)     All privacy settings and other account settings, including privacy settings for
         individual Facebook or Instagram posts and activities, and all records showing
         which Facebook or Instagram users have been blocked by the account; and

(q)     All records pertaining to communications between Facebook and any person
         regarding the user or the user's Facebook or Instagram accounts, including
         contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within
14 days of issuance of this warrant.

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Sections 922(g) and 2119 involving Zabar Irick since July 1, 2015, including, for each username identified on Attachment A, information pertaining to the following matters:

(a)  Communications between co-conspirators relating to the August 22, 2020 carjacking;

(b)  Communications relating to shootings, intended victims, accessing or purchasing firearms, hiding firearms and coordinating meetup locations and lookouts in relation to criminal activity;

(c)  Records and information, including any images or videos, relating to the possession or use of a firearm;

(d)  Evidence relating to clothing worn by the perpetrator of the November 4, 2020, November 10, 2020 and February 6, 2021 shooting incidents (the "Shooting Incidents");

(e)  Records and information regarding the identities and location of co-conspirators involved in the August 22, 2020 carjacking or co-conspirators involved in planning, coordinating or concealing the Shooting Incidents and firearms involved therein;

(f)  Evidence indicating how and when the Facebook and Instagram accounts were accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook and Instagram account owner;

4

(g) Evidence indicating the Facebook and Instagram account owner's state of mind as it relates to the crime under investigation; and

(h) The identity of the person(s) who created or used the usernames, including records that help reveal the whereabouts of such person(s).